James Parker and his wife Rosie Parker sued Life Insurance Company of Georgia and James Mark Taunton in his capacity as an agent of the insurance company, alleging conversion, intentional misrepresentation, and fraudulent suppression of material facts in relation to the defendants' sale of life insurance policies to the Parkers. The trial court entered a summary judgment for Life of Georgia as to the conversion claim, but denied its summary judgment motion as to the fraud claims. At trial, the defendants moved for a directed verdict at the close of the plaintiffs' evidence and at the close of all evidence; the trial court denied those motions. The jury returned a verdict in favor of the Parkers, awarding them $4,276 in compensatory damages and $200,000 in punitive damages. Life of Georgia moved for a JNOV, challenging the sufficiency of the evidence and the amount of the punitive damages award; the trial court denied that motion and entered a judgment on the verdict on February 7, 1996. Life of Georgia appeals from the denial of its motions for a directed verdict and a JNOV.[1] *Page 1110 
 I.
"The standard of appellate review applicable to a motion for directed verdict is identical to the standard used by the trial court in granting or denying the motion initially. Thus, when reviewing the trial court's ruling on the motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration." Ogle v. Long, 551 So.2d 914,915 (Ala. 1989). The standard of review for testing the sufficiency of the evidence when the sufficiency is challenged by either a motion for directed verdict or a motion for JNOV is the "substantial evidence rule." Id. Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). In considering the question of the sufficiency of the evidence, we are required, as was the trial court, to view the evidence in the light most favorable to the nonmovant. Bussey v. JohnDeere Co., 531 So.2d 860, 863 (Ala. 1988).
Viewed in the light most favorable to the Parkers, the evidence suggests the following: In 1993, James Mark Taunton, after working as an agent for another insurer for over 20 years, began employment as an agent for Life of Georgia. He was assigned a debit route that he worked regularly, collecting premium payments from policyholders and soliciting new business. Taunton soon met the Parkers, who were Life of Georgia policyholders on his debit route. He learned that James and Rosie Parker were 68 years old and 70 years old, respectively, and that both of them were in poor health. He also learned that Rosie Parker was legally blind because of diabetes and that the Parkers' only income was a monthly Social Security check.
In December 1993, Taunton visited the Parkers to conduct a "policy review" and to determine if they could buy more insurance from Life of Georgia. He saw that they had purchased three life insurance policies from Life of Georgia in 1981.[2] He noted that James Parker had a $1,000 policy and a $500 policy and that Rosie Parker had a $1,000 policy; all of these policies would pay the full face amount of benefits upon the Parkers' deaths.[3] Taunton was aware that the three policies would pay full benefits and that the Parkers could no longer qualify for whole-life policies, because of their age and health. Instead they could qualify only for a "graded-death-benefit" policy; with such a policy they would have to pay premiums for a minimum of three years before the policy would be worth its full face value upon their death.
Taunton pointed out to them that Rosie Parker had less insurance on her life than did her husband James, and he encouraged the Parkers to buy more insurance to "even out" their coverage. Taunton told them that he could "fix it" so that the Parkers could each have $2,000 in life insurance coverage. Taunton could not "even up" the Parkers' insurance by merely selling them another $500 policy, because Life of Georgia had stopped selling policies that small. Taunton therefore suggested that James Parker cash in his $500 policy and indicated that, if he did, the Parkers could receive "400 and something dollars" before Christmas, only a few weeks away. Taunton told them that they could purchase two new $1,000 policies, which he said he would add on to the two $1,000 policies they already had, combining the monthly premiums and giving them each $2,000 in coverage.
Taunton did not disclose to the Parkers that because of their age and health he could not sell them full-benefit policies. He did not inform them that the policies he would obtain for them would be graded-death-benefit policies that would not pay full benefits until after three years. Taunton told the Parkers that, with the new policies added to their 1981 policies, they would each have $2,000 in coverage; however, Taunton knew that the Parkers would not have this amount of coverage *Page 1111 
until the new policies had matured for three years.
The Parkers agreed that they wanted to have $2,000 apiece in death benefits and, believing that they were buying whole-life policies, signed the applications for the new policies. At the top of the applications were these words: "Application for Graded Death Benefit Life Insurance"; at the signature line were the words "I understand fully that this policy has a limited death benefit for the first three years." The applications did not define the terms "graded death benefit" or "limited death benefit" or explain how the benefits would be limited for the first three years.
Although the Parkers agreed to cash in James Parker's $500 policy, Taunton did not at that time execute the necessary paperwork to cash in the $500 policy, and the Parkers did not receive a check for the cash value of the $500 policy before Christmas. Life of Georgia did, however, issue two $1,000 graded-death-benefit policies to the Parkers, and Taunton went to their house in January 1994 to begin collecting the premiums for the new policies. James Parker explained to Taunton that he could not afford to pay the premiums, and Taunton told him that when the Parkers received their check for the cash value of the $500 policy, they could use it to pay the premiums on their insurance.
Toward the end of January 1994, the Parkers passed Taunton on the street as they were driving and he signaled for them to stop. He went to their car and gave James Parker a document to sign to cash in the $500 policy. Soon thereafter, the Parkers received a check for $141.17, representing the cash value of the policy. Mrs. Parker, still expecting to receive the "400 and something dollars" that she believed was due on the policy, delayed cashing the check, waiting until Taunton's next monthly stop at her house, when she planned to inquire why the amount was so small.
Life of Georgia normally directs its agents to continue making monthly calls on insureds who miss premium payments and to give them several months to make the payments current so that the policies may remain in force. However, Taunton did not return to the Parkers' house again after they failed to pay the January 1994 premium on the policies, and Mrs. Parker ultimately cashed the check.
After the Parkers did not make the January 1994 premium payment, the new graded-death-benefit policies lapsed. Because the premiums for the two $1,000 policies the Parkers had bought in 1981 had been added with the premiums for the two new policies, the Parkers' nonpayment of the premiums also caused the 1981 policies to lapse. However, there were certain provisions within the 1981 policies that thereafter went into effect. James Parker's policy was converted to "extended term insurance"; this meant that Life of Georgia used the net cash value of the 1981 policy to purchase term insurance that would pay the full face value of $1,000 at the event of his death, but shortened the period of coverage. James Parker was left with $1,000 in benefits payable upon his death, but only until December 8, 1999. Rosie Parker's 1981 life insurance policy converted to "reduced paid-up" status; that is, the cash value of her policy was lessened, but the policy would remain in effect for the same period as the original policy. Rosie Parker was left with a full coverage period, but only $608 in benefits for her beneficiaries upon her death.
The Parkers argued at trial that they had agreed to cash in the $500 policy only because Taunton represented that they would receive "400 and something dollars," i.e., most of the policy's face amount, at a time when they had a pressing need for the money. They further argued that Taunton suppressed the fact that the new $1,000 policies he wanted them to buy were graded-death-benefit policies, not whole-life policies. The Parkers argued that they would not have bought the new policies if they had known that they were graded-death-benefit policies. The Parkers also pointed out that, because of the changes in their coverage that they made based upon Taunton's representations, they lost part of the benefit of their 1981 policies, which, after the new policies lapsed, were converted into policies with lesser coverage. They claimed damages based upon the lesser amount of cash value that they received for *Page 1112 
the $500 policy, as well as $4,000 for the loss of the amount of coverage that they had believed the change in their policies would immediately bring them. They further sought damages for the stress, anxiety, and mental anguish they testified to having suffered as a result of their dispute with Life of Georgia.
 II.
Life of Georgia first argues that the evidence was insufficient to support the Parkers' fraudulent suppression claim and that the trial court thus erred in denying its directed verdict and JNOV motions on this claim. To establish their claim of fraudulent suppression, the Parkers were required to show: (1) that Life of Georgia had a duty to disclose an existing material fact; (2) that Life of Georgia had actual knowledge of the fact and its materiality; (3) that Life of Georgia suppressed that fact; (4) that the Parkers' lack of knowledge concerning that fact induced them to act; and (5) that they suffered actual damage as a proximate result of their action. Hardy v. Blue Cross Blue Shield, 585 So.2d 29
(Ala. 1991). Under Ala. Code 1975, § 6-5-102, the particular circumstances that impose upon a party a duty to communicate a material fact may arise from the relationship between the parties, the relative knowledge of the parties, and the value of the particular fact and other circumstances. See Mason v.Chrysler Corp., 653 So.2d 951 (Ala. 1995). Where one person has superior knowledge of a fact and suppression of that fact will induce another person to take action that he or she otherwise would not take, the obligation to disclose is particularly compelling. Dominick v. Dixie Nat'l Life Ins. Co.,809 F.2d 1559 (11th Cir. 1987).
We hold, under the undisputed facts of this case, that Taunton, and, through him, Life of Georgia, had a duty to disclose to the Parkers the kind of policy they were purchasing, particularly in view of the Parkers' lack of education, their advanced age, and their poor health. The limitations of the new policies the Parkers were buying and the effect the change in insurance could have on their existing policies were material facts known to Life of Georgia, but which the Parkers had little means of knowing. The evidence also establishes that Life of Georgia had a duty to disclose the fact that, because of the Parkers' age and poor health, the new policies were of less value to them than their 1981 policies. A jury could thus conclude that as a result of Taunton's failure to disclose these facts the Parkers were induced to change their insurance, when they might not otherwise have done so.
Viewed in the light most favorable to the Parkers, the evidence shows that Taunton did not tell the Parkers that the new policies would not pay the full face value in benefits unless their deaths occurred after the policies had been in effect three years. Taunton did not explain that allowing the new policies to lapse would result in a modification of the two $1,000 policies the Parkers had maintained since 1981. Instead, Taunton merely impressed upon the Parkers their need to "even up" their coverage by purchasing more insurance, which they could not afford, and to compromise the modest, but stable, insurance policies they had maintained since 1981.
Life of Georgia argues that even if Taunton did not orally disclose to the Parkers that the new $1,000 policies were graded-death-benefit policies, they should have understood from reading the application what kind of policy they were buying, instead of relying upon Taunton to explain it to them. Life of Georgia emphasizes that the words "graded death benefit life insurance policy" were in the heading of the application and that a sentence near the signature line indicated the new policy would provide "limited death benefits" for the first three years. We do not agree that merely placing these terms on the application was the functional equivalent of explaining them to Rosie Parker, who is blind and could not read the application, or to James Parker, who has only a sixth-grade education and is a not sophisticated insurance buyer. As stated, Taunton's superior knowledge of the terms and his years of experience in selling such policies placed upon him the duty to inform the Parkers, at the very least, what kind of insurance they were buying, and he failed to do so. We therefore conclude that the trial court properly denied Life of Georgia's directed verdict *Page 1113 
and JNOV motions as to the Parkers' fraudulent suppression claim.
 III.
Life of Georgia next argues that the evidence is not sufficient to support the Parkers' misrepresentation claim. To establish their claim of misrepresentation, the Parkers were required to show (1) that Taunton misrepresented a material fact; (2) that he did so willfully to deceive, recklessly without knowledge, or mistakenly; (3) that they relied on the misrepresentation and that under the circumstances their reliance was justifiable;[4] and (4) that they were caused damage as a proximate consequence of their reliance. Harrington v.Johnson-Rast Hays Co., 577 So.2d 437 (Ala. 1991). The Parkers argued that Life of Georgia misrepresented two material facts: (1) that they would not be entitled to the full face amount of death benefits under the two new $1,000 policies until the fourth year of the policy period, and (2) the amount of money they would receive when they cashed in the $500 policy.
Life of Georgia argues that even if Taunton, as the insurance company's agent, did misrepresent the limitations on the two $1,000 graded-death-benefit policies, he did not do so intentionally. However, Taunton assured the Parkers that by buying two new $1,000 policies and adding them to their existing $1,000 policies, they would have $2,000 each in life insurance coverage. He knew when he made this representation that the Parkers would not have the benefit of $2,000 each in life insurance coverage when they bought the new policies, but would have to pay for them for three years before the policies would pay the full amount of benefits in the event of their deaths. He also knew that the Parkers were elderly and in poor health, two conditions that made them anxious about their immediate future and weighed against the likelihood that they would desire to buy insurance that would not pay full benefits until years later.
Life of Georgia points out that Taunton earned only a very small commission on his business with the Parkers and could have earned much more by persuading them to cash in all of their existing policies and "evening out" their insurance by purchasing two $2,000 graded-death-benefit policies.[5]
Essentially, Life of Georgia argues that Taunton did not mislead the Parkers into buying the graded-death-benefit policies, because, it claims, they did not buy enough of it to generate a greater gain for him. However, there is evidence that, but for Taunton's misleading statements, the Parkers would not have bought graded-death-benefit policies in any
amount or even considered "evening out" their insurance coverage. Taunton represented to the Parkers that he could obtain for them two policies that, when added to their two existing $1,000 policies, would give them a death benefit of $2,000 each. Taunton knew, based upon their health and age, that the only kind of policy he could sell to the Parkers was a graded-death-benefit policy. Taunton knew when he sold them the new policies that this kind of policy would not immediately give the Parkers the full benefit he represented that the policies would have. Rosie Parker testified that the Parkers would not have bought the policies had they known that they would have to wait three years before the policies would provide the full face value in death benefits. The fact that Taunton did not sell the Parkers a greater amount of graded-death-benefit insurance, for a greater profit, does not change the evidence indicating that the Parkers bought the $1,000 policies in reliance upon Taunton's misrepresentations and might not otherwise have bought those policies. Based on these facts, the jury could have concluded that Taunton's misrepresentation as to the *Page 1114 
limitation of the graded-death-benefit policies was intentional.
Life of Georgia next argues that the evidence does not support a finding that Taunton misrepresented the amount of cash value that the Parkers would receive for the $500 policy. Life of Georgia correctly points out that, in the end, it did pay the Parkers $141.17, the amount they were actually due under the policy, and that it did so well within the six-month period allowed by the insurance policy. However, we do not agree with Life of Georgia that the ends justify the means in this case; although the Parkers ultimately received the amount they were due, there is evidence that they would not have cashed in the $500 policy at all if Taunton had not misrepresented both the amount they would receive and the time within which they would receive it. It is clear that the Parkers relied upon Taunton to inform them about the effect of their cashing in the policy, and their reliance was particularly justified in view of their age, health, and lack of education. As to the claim of fraudulent misrepresentation, the trial court properly denied Life of Georgia's motion for a directed verdict and its motion for a JNOV.
 IV.
Life of Georgia next argues that the punitive damages award is excessive and amounts to a violation of its due process rights guaranteed by the Fourteenth Amendment. In its motion for a JNOV, Life of Georgia asked the trial court, among other things, to require a remittitur of punitive damages, based upon the claim of excessiveness; the court denied the motion, but the record does not contain written findings of fact to support the trial court's conclusion that the award was not excessive. See Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986). This Court stated in Hammond:
 "The cases have consistently held that in deciding whether a jury verdict is excessive because it is the result of passion, bias, corruption, or other improper motive, a trial judge may not substitute his judgment for that of the jury. We have also recognized that the trial judge is better positioned to decide whether the verdict is so flawed. He has the advantage of observing all of the parties to the trial — plaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. There are many facets of a trial that can never be captured in a record, so that the appellate courts are at a special disadvantage when they are called upon to review trial court action in this sensitive area, although increasingly they are required to do so. Therefore, it is not only appropriate, but indeed our duty, to require the trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages."
493 So.2d at 1378-79 (citations omitted) (emphasis added). Because the trial court did not put in the record its reasons for refusing to interfere with the jury's verdict on grounds of excessiveness, we are unable to review its ruling on that issue. We therefore must remand this cause to allow the trial court to make written findings of fact on this issue, in compliance with Hammond.
We affirm the trial court's denial of Life of Georgia's directed verdict motion and its JNOV motion as they relate to the sufficiency of the evidence to support the Parkers' fraud claims. However, we remand the case for the trial court to make written findings on the issue of excessiveness of the punitive damages award. The trial court is directed to file a return with this Court within 28 days of the date of this opinion.
AFFIRMED IN PART AND REMANDED.
SHORES, HOUSTON, KENNEDY, and COOK, JJ., concur.
HOOPER, C.J., and MADDOX and SEE, JJ., concur in part and dissent in part.
[1] Rule 50, Ala. R. Civ. P., as amended effective October 1, 1995, renames the "motion for a directed verdict" a "motion for a judgment as a matter of law," and renames a "motion for a judgment notwithstanding the verdict" a "renewal of the motion for a judgment as a matter of law." The standard of review for a motion for a judgment as a matter of law is the same as for a motion for a directed verdict and a motion for a JNOV.
[2] The Parkers had also purchased two $1,000 policies in 1987, but they had cashed in those policies in April 1993.
[3] James Parker's $1,000 and $500 policies were whole-life policies. Rosie Parker's $1,000 policy was a matured graded-death-benefit policy that would pay its full face value at her death.
[4] The complaint in this case was filed before this Court issued its opinion in Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala. 1997), which overruled Hickox v. Stover, 551 So.2d 259 (Ala. 1989). That Foremost Ins. Co. opinion replaced the "justifiable reliance standard" in fraud cases with the "reasonable reliance standard."
[5] The record shows that if an insured cashes in a policy, or allows it to lapse, an agent who rewrites insurance for that insured will earn a commission only if the premium for the new policy is greater than that of the previous policy. Under this rule, Taunton, in effect, received a commission only upon the $1,000 policy that he sold Rosie Parker.