On Return to Remand
The defendants, Life Insurance Company of Georgia ("Life of Georgia") and its agent James Mark Taunton, appealed from a judgment, based on a jury verdict, awarding compensatory and punitive damages to the plaintiffs, James Parker and his wife Rosie Parker. In our first opinion in this case, *Page 620 Life Insurance Co. of Georgia v. Parker, 706 So.2d 1108 (Ala. 1997) ("Parker I"),[1] we affirmed the judgment insofar as it held the evidence sufficient to support a punitive award, but we remanded the case for the trial court to consider whether the punitive-damages award was excessive. Although the trial court apparently had reviewed the punitive damages award for excessiveness, applying the factors set out in Green Oil Co. v.Hornsby, 539 So.2d 218 (Ala. 1989), it did not make written findings as to those factors, and, thus, this Court was unable to review its ruling on the question of excessiveness. On remand, the trial court entered an order stating its findings pursuant toGreen Oil, again upholding the jury's award of punitive damages. It has now made its return to our remand order.
We note that, although there was a division among members of this Court in Parker I as to whether certain issues should have been submitted to the jury, a majority of the Court agreed that the evidence supported the trial court's denial of the defendants' motions for a judgment as a matter of law. We do not revisit today the issues that were before us in Parker I; the only issue before us now is whether the punitive damages award is excessive. This point of departure assumes that the jury properly could have awarded some measure of punitive damages.
 I.
The facts of this case were set out at length in Parker I, and we will restate only those that are most important. In 1993, Taunton, acting as an agent for Life of Georgia, visited the Parkers to conduct a "policy review"; he learned that they held three Life of Georgia life insurance policies. James Parker, age 70, had two paid-up policies in the amounts of $1,000 and $500, while his wife, age 68, had one paid-up policy in the amount of $1,000. Taunton was aware that all three policies would pay the full face amount upon the Parkers' deaths. He also was aware that, based upon their ages and their health, the Parkers could qualify only for graded-death-benefits policies; i.e., policies that would require them to pay premiums for a minimum of three years before the policies would be worth their full face value. According to Mrs. Parker, Taunton represented to the Parkers that if they would cash in James Parker's $500 policy and buy two $1,000 policies, Taunton could "even up" their coverage so that both of them would have $2,000 in coverage at the time of their deaths. Taunton did not reveal to the Parkers that the new $1,000 policies would be graded-death-benefits policies. The Parkers, believing they were buying whole-life policies, signed the applications for the new coverage. Taunton represented to the Parkers that, by cashing in James Parker's $500 policy, they would receive "four hundred and something" dollars within a few weeks. Because their discussion with Taunton occurred shortly before Christmas, the Parkers had a special need for the money, and Taunton's representations helped convince them to cash in the $500 whole-life policy. In reality, the Parkers were due only $141.17 for the cash value of the policy.
Taunton did not immediately execute the paperwork necessary to cash in the $500 policy, so the Parkers did not receive any money from it until January. Taunton joined the premiums for the two new policies he had sold to the Parkers with the premiums for their existing policies, which they had bought in 1981. The Parkers ultimately were unable to pay even the first of the increased premiums on the two new $1,000 policies. The new policies lapsed, and the two existing policies were converted into policies with lesser coverage. James Parker's 1981 policy converted into "extended term insurance"; that is, Life of Georgia used the net cash value of the policy to purchase term insurance that would pay the full $1,000 benefits upon James Parker's death, but only if he died within three years. Beyond that period, he had no coverage. Rosie Parker's 1981 policy converted to "reduced paid-up" status — that is, the cash value of her policy was lessened although the same policy period remained in effect. The elderly Parkers' meager *Page 621 
life insurance portfolio thus was eroded by Taunton's efforts to sell them more coverage.
Based upon these facts, as explained in further detail inParker I, the jury returned a verdict for the Parkers on their claims of intentional misrepresentation and fraudulent suppression of material facts, awarding them $4,276 in compensatory damages and $200,000 in punitive damages.
 II.
The defendants argue that the punitive damages award was excessive and thus violated their right to due process under theFourteenth Amendment of the United States Constitution. BMW ofNorth America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589,134 L.Ed.2d 809 (1996) ("BMW I"). In BMW I, the United States Supreme Court reversed this Court's affirmance of a large punitive damages award in a case in which the purchaser of an automobile had suffered a relatively small economic loss. The Supreme Court established the rule that a defendant in a civil action has a due-process right to notice as to what measure of punitive damages can be assessed for that defendant's alleged wrongdoing. In providing three guideposts by which to review the question of excessiveness of a punitive-damages award, the majority in BMW I
did not overrule the review process already established by this Court in Hammond v. City of Gadsden, 49.3 So.2d 1374 (Ala. 1986), and Green Oil, 539 So.2d at 223-24. In BMW of North America, Inc.v. Gore, 701 So.2d 507 (Ala. 1997) (on remand from the Supreme Court of the United States) ("BMW II"),[2] we noted that "[a]s we read the BMW [I] opinion, the United States Supreme Court's guideposts are not intended to exclude judicial consideration of other factors that might bear on the question of excessiveness." 701 So.2d at 510.
The defendants challenge the punitive damages award both on the basis of the "guideposts" established by the United States Supreme Court in BMW I and on the basis of the factors this Court set out in Hammond and Green Oil. In other words, they collectively argue that the award exceeds any amount justified by the evidence and thus is a denial of due process.[3]
 A. The BMW I guideposts.
We begin with an analysis of the guideposts established by the United States Supreme Court in BMW I.
1. The reprehensibility of the defendants' conduct.
"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW I, 517 U.S. at 575, 116 S.Ct. 1589. Although the Supreme Court did not provide any particular yardstick by which to measure reprehensibility, it did acknowledge that trickery and deceit are more reprehensible than negligence, and that acts of affirmative misconduct, such as making deliberate false statements, are more reprehensible than making an innocent misrepresentation. The Supreme Court further recognized that economic damage inflicted upon a financially vulnerable plaintiff might well support a large punitive-damages award. BMW I, 517 U.S. at 576, 116 S.Ct. 1589.
The crux of this case is Life of Georgia's marketing of insurance to customers who were particularly vulnerable because of their age, their lack of formal education, and their financial status. See Parker I, 706 So.2d at 1112. Although the record contains little evidence relating to the exact level of James Parker's understanding of insurance,[4] *Page 622 
the jury could have concluded that the Parkers did not have Taunton's level of understanding as to what the consequences could be if they followed his advice to "even up" their coverage by cashing in one of their full-benefit policies to buy two graded-death-benefits policies that they could not afford. The record contained evidence indicating that Taunton, as Life of Georgia's agent, had superior knowledge of the terms of the policies he sold. Taunton's years of experience in selling insurance, as well as his superior knowledge, placed upon him the duty to inform the Parkers, at the very least, of what kind of insurance they were buying. The evidence shows that, based upon Taunton's misrepresentations as to the kind of insurance he was selling to the Parkers, they were induced to buy more insurance and ultimately ended up with less coverage than they had before they were induced to act. Moreover, the jury apparently chose to believe Rosie Parker when she testified as to the assurances she said Taunton made to her about the amount of money the Parkers would receive upon surrendering James Parker's $500 policy.
We note, however, that there is a marked lack of evidence indicating any malicious intent on Taunton's part; indeed, in a time when seven-figure awards against insurance companies in fraud cases receive great notoriety, the fact that the jury awarded punitive damages of only $200,000 is more consistent with a finding of recklessness than with a finding that Taunton had an intent to harm the Parkers. Viewed in this light, the defendants' conduct should not be regarded as having been highly reprehensible.
 2. The ratio of the compensatory-damages award to the punitive-damages award.
A second indicium of either reasonableness or excessiveness is the ratio of the punitive-damages award to the actual harm inflicted upon the plaintiff. BMW I, 517 U.S. at 580,116 S.Ct. 1589. The guaranty of due process does not require that we apply a purely mathematical formula in determining whether a punitive-damages award is excessive; therefore, in most cases, a remittitur will not be justified solely on the basis of a high ratio. However, a general concern of reasonableness properly enters into the constitutional calculus. BMW I,517 U.S. at 582-83, 116 S.Ct. 1589 (quoting TXO Production Corp. v. AllianceResources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366
(1993)). A higher award may be justified in a case in which the injury to the plaintiff is hard to detect or the monetary compensation for noneconomic harm is difficult to determine. Id.
This Court has found constitutionally acceptable ratios ranging from 1:1 in Ford Motor Co. v. Sperau, 708 So.2d 111 (Ala. 1997), to 121:1 in Foremost Ins. Co. v. Parham., 693 So.2d 409 (Ala. 1997). The facts of those cases, and of cases in which ratios of punitive damages to compensatory damages fall between those ofSperau and Foremost, are varied and reflect the wisdom of this Court's refusal to draw a mathematical bright line to apply in every case.
In this case, the punitive damages award of $200,000 is 46.77 times the compensatory damages award of $4,276. Although the harm to the Parkers for which they were compensated was comparatively small, the Parkers were both financially vulnerable and elderly, so that the economic loss, including the reduction of their insurance coverage as a result of Taunton's actions, had a more severe impact upon them than it might have had upon younger, more affluent customers. Under these circumstances, we conclude that a somewhat higher ratio of punitive damages to compensatory damages may be justified.
3. Sanctions for comparable misconduct.
We must consider a third indicium of reasonableness or excessiveness, a comparison of the punitive-damages award and the civil or criminal penalties that could be imposed for comparable misconduct. BMW I, 617 U.S. at 583, 116 S.Ct. 1589. The maximum statutory sanction against insurance fraud in this state is only $1,000. As this Court has *Page 623 
noted, "[b]ecause the legislature has set the statutory penalty for deceitful conduct at such a low level, there is little basis for comparing it with any meaningful punitive damages award." BMWII, 701 So.2d at 514. Alabama has no criminal laws against insurance fraud.
4. Summary of the BMW I analysis.
After reviewing the evidence and analyzing the BMW I
guideposts, we find, based upon the relatively low level of reprehensibility presented here, coupled with our uneasiness over the rather high 46.77:1 ratio of punitive damages to compensatory damages, an indication that the punitive-damages award was excessive.
B. The Hammond/Green Oil factors.
We now consider the factors established by this Court in Hammond and Green Oil.
 1. The punitive-damages award and the actual or likely harm caused.
"`Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.'" Green Oil, 539 So.2d at 223 (quoting Aetna Life Ins. Co. v. Lavoie,505 So.2d 1050, 1062 (Ala. 1987) (Houston, J., concurring specially)).
As a result of the defendants' misconduct, the Parkers were induced to purchase insurance they could not afford, and the premiums for the new policies were added into the premiums they were paying on their existing policies. When the Parkers were unable to pay the increased premiums and the new policies lapsed, their existing policies were converted into lesser coverage. SeeParker I, 706 So.2d at 1111. Moreover, based upon the defendants' misconduct, the Parkers cashed in a $500 full-benefit policy that they otherwise would have kept. Although the actual amount of their losses was not large, the fact that the Parkers were financially vulnerable made the losses more serious. We conclude that the degree of harm resulting from the defendants conduct supports the imposition of more than token punitive damages. This factor thus weighs against a finding that the punitive-damages award was excessive.
2. The reprehensibility of the defendants' conduct.
Although we discussed this factor in our review of the BMW I
guideposts, we note that in a Hammond/Green Oil review we assess the reprehensibility of a defendant's conduct by considering "`[t]he duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover up" of that hazard, and the existence and frequency of similar past conduct.'" Green Oil, 539 So.2d at 223. We have concluded that the defendants' misconduct resulted in damage to the Parkers that would correspond with a significant punitive-damages award; however, we note that the record does not indicate a pattern of like misconduct, and it does not contain evidence indicating that the defendants sought to "cover up" the misconduct. The reprehensibility of Taunton's misconduct lies in the fact that it resulted in a loss to the financially vulnerable Parkers, with whom he dealt recklessly, not in any demonstrated malicious intent to defraud the Parkers for profit. Compare Foster v. LifeInsurance Co. of Georgia, 656 So.2d 333 (Ala. 1994) (agent intentionally sold worthless Medicare-supplement policy to uneducated and financially vulnerable Medicaid recipient); LifeInsurance Co. of Georgia v. Johnson, 701 So.2d 524 (Ala. 1997) (agent engaged in intentional and reckless fraud and fraudulent suppression in selling worthless Medicare-supplement policy to elderly woman). Thus, while the misconduct at issue would support a significant punitive-damages award, we reiterate that it does not reflect the degree of reprehensibility, often marked by greed, that has been the basis of large punitive-damages awards in the past. This factor thus weighs against a finding that the punitive-damages award is excessive.
3. The defendants' profit from their misconduct.
If a Hammond/Green Oil review indicates that the wrongful conduct was profitable to *Page 624 
the defendant, we are required to determine whether the punitive-damages award removes the profit and whether it exceeds the profit so that the defendant recognizes a loss. Green Oil, 539 So.2d at 223. The evidence shows that Life of Georgia gained little, if any, profit from Taunton's sale of the two $1,000 policies because the Parkers were unable to pay even the first premiums on them.[5] Taunton's commission on the sale was nominal. Clearly, the punitive-damages award removes any profit the defendants realized and so far exceeds it that the defendants would recognize a loss. This factor thus weighs in favor of a finding that the punitive-damages award is excessive.
4. The defendants' financial position.
There is no specific evidence before this Court as to the net worth of either defendant at the time the jury awarded the damages, and the trial court's findings upon remand are silent as to the financial position of the defendants. No argument has been advanced as to the adverse effect of the award on either defendant. This factor thus weighs against a finding that the punitive-damages award is excessive.
5. The costs of litigation.
In a Hammond/Green Oil review, we must consider whether the punitive-damages award was sufficient to reward the plaintiff's counsel for assuming the risk of bringing the lawsuit and to encourage other victims of wrongdoing to come forward. The trial court's findings upon remand are silent as to this factor. The record in is this case reflects pretrial proceedings culminating in a two-day trial before a jury, and thereafter extensive posttrial and appellate proceedings, together with thorough briefs on both the initial appeal and on this return to the remand. The Parkers clearly incurred substantial litigation costs in order to recover on a relatively small out-of-pocket claim. Under the totality of the circumstances concerning the cost of litigation, this factor weighs against a finding that the punitive damages award is excessive.
6. Criminal sanctions.
No criminal sanctions have been imposed on Life of Georgia or Taunton; therefore, this factor is inapplicable here.
7. Other civil actions.
In its findings on remand, the trial court stated:
 "[B]ecause . . . Life of Georgia has been sued many times in Alabama, largely based on misconduct of its agents, [it] must be aware of the hazards of [its] actions. While it may not be said that Life of Georgia deliberately engages in misconduct through its agents, allegations of misconduct have happened frequently, and there have been numerous adverse verdicts throughout the state."
The trial court also pointed out: "By the very nature of the [insurance] business, there are fairly low-paid agents who may be largely untrained who are not subjected to strict standards by the employer or the state, who are assigned debit routes, and must produce. The company knows this." We agree that Life of Georgia's past misconduct, for which it has been punished in other proceedings, places the company on notice of the punishment that it could receive for similar misconduct. However, Taunton's actions on Life of Georgia's behalf reflect a markedly lower degree of reprehensibility than that present in other cases that have resulted in large punitive-damages awards against Life of Georgia. See Foster v. Life Insurance Co. of Georgia., supra;Life Insurance Co. of Georgia v. Johnson, supra. The record does not indicate that any other civil actions have been filed against the defendants based on the level of misconduct present here; other cases against Life of Georgia that this Court has reviewed involved a far greater degree of reprehensibility. This factor thus weighs in favor of a finding that the punitive damages award is excessive.
8. Summary of the Hammond/Green Oil analysis.
After considering the seven Hammond/Green Oil factors, we conclude as follows: *Page 625 
Three of the factors weigh in favor of a finding of excessiveness: the degree of reprehensibility of the defendants' conduct, the degree to which the defendants profited, and the other civil actions against them. Three of the factors weigh against a finding of excessiveness: the relationship of the damages award to the harm done to the Parkers, the defendants' financial position, and the costs of litigation. One of the factors is inapplicable.
 C. Final analysis.
We began our review in this case by considering the due-process guideposts set out by the United States Supreme Court in BMW I, and we concluded that those guideposts indicated that the punitive-damages award in this case was excessive. We continued our review by considering the Hammond/Green Oil factors. of the six factors applicable to this case, three of them weighed against a finding that the punitive-damages award was excessive. We now return to a final consideration of the question of excessiveness of the punitive-damages award in light of BMW I. A punitive-damages award of $150,000 would reduce the ratio of punitive damages to compensatory damages from 46.77:1 to 35:1. Based on the level of reprehensibility of the misconduct evidenced in this case, coupled with the financial vulnerability of the plaintiffs and the litigation costs incurred, we conclude that a $150,000 punitive-damages award is sufficient to punish the defendants and to deter them from further misconduct similar to that evidenced in this case, without compromising their due-process rights.
 III.
The judgment is affirmed, on the condition that the Parkers file with this Court within 21 days a remittitur of punitive damages to the sum of $150,000; otherwise, the judgment will be reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.*
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, and COOK, J.J., Concur.
ALMON and KENNEDY, JJ., concur in the result.
SEE, J., dissents.
[1] James Mark Taunton was not named as an appellant in the style of Parker I. Nevertheless after reviewing the record and the briefs submitted in this case, we find it clear that both Taunton and Life of Georgia appealed from the judgment against them.
[2] We note that this case was tried in February 1996, well before the opinion of this Court in BMW II was released on May 9, 1997. As was the case in BMW II, no claim for damages for mental anguish was asserted in this case.
[3] Indeed, we do not consider that a challenge, pursuant toBMW I, to the constitutionality of a punitive-damages award is a necessary prerequisite to trigger this Court's review underHammond/Green Oil. The Hammond/Green Oil review is available at the defendant's request, and a punitive-damages award need not be found to be so excessive as to violate the due-process guaranty for it to be found excessive based upon the sufficiency of the evidence.
[4] The dissenters in Parker I were disturbed over James Parker's failure to testify at trial and suggested that he had a degree of sophistication that would have made the plaintiff's case weaker. Of course, the defendants could have called James Parker as a hostile witness.
[5] However, as the trial court pointed out in its findings on remand, Life of Georgia would have benefited from the sale had the Parkers been able to pay the premiums.
* Note from the reporter of decisions: An entry on the Supreme Court's docket indicates that on November 23, 1998, the appellees filed a "consent and acceptance of remittitur of punitive damages."