Plaintiffs, Wanda Borden and Coy Borden, were insureds of State Farm Mutual Automobile Insurance Company. They sued State Farm, and in the only count of their complaint here applicable, claimed that John Sanders, State Farm's claims adjuster, negotiated a settlement with them under the uninsured motorist coverage, and in doing so made certain misrepresentations to them. They claimed $250,000 as damages. The jury awarded them $12,500. The trial court entered a judgment thereon and overruled State Farm's motions for judgment notwithstanding the verdict and for a new trial.
State Farm states the issues:
(1) Was there sufficient evidence of fraud to submit the issue to the jury?
(2) Was there sufficient evidence submitted to warrant an award by the jury of punitive damages?
We have very carefully read the record and are convinced that the court did not err in submitting the issue of fraud to the jury.
State Farm's insurance adjuster has adjusted automobile insurance claims for 16 years. He adjusted, on an average, 35 to 40 claims per month. He was aware of the extent of uninsured motorist coverage provided by the policy. He knew the motorist who was at fault in the accident did not have insurance. He knew the extent of the injuries suffered by State Farm's insured.
The testimony was conflicting as to what the claims adjuster told the insureds at the time they signed the release form, but the jury could have believed the insured's version, which was to the effect that the adjuster did not advise them that by signing the form they were releasing a valid claim they had for pain and suffering, loss of services and loss of consortium, all under the uninsured motorist provisions of the policy.
The insured testified regarding the negotiations surrounding the execution of the release:
 "Q. And the Twenty-two Hundred Dollars, did you receive a check from Mr. Sanders as payment for the truck?
"A. That's right, yes, sir.
 "Q. Did you have a discussion with him about your contention that the truck was worth the fair market value of Twenty-five Hundred Dollars?
 "A. Yes, I told him that I would have to have Twenty-five Hundred Dollars, because I felt that was a fair price for it. And he said that he couldn't go over the book price, that he would slip me in a little later to cover that.
"Q. To cover the difference —
 "A. That's right, between the Twenty-two up to the Twenty-five.
* * * * * *
 "Q. If you would, then, please, sir, just tell us what took place from the time that you and your wife arrived down at Mike's Office and what was said?
 "A. Well, as we went in he told us to come on and have a seat in here. He said we will —
"Q. Who did?
"A. Mr. Sanders.
"Q. All right.
 "A. He said we would get this agreement signed up, and he said that we could sign as quick as possible and I could get back to work.
"Q. All right, sir. And then what happened?
 "A. Well, sir, he just made out the forms here, and he just pushed them over *Page 30 
there for me to sign. And he didn't tell me what it was for. The only thing he said I was signing was for her hospital, her loss of wages and doctor bills and earnings and inconveniences was going to cause us.
"Q. Well, did you all talk about any inconveniences?
* * * * * *
 "A. Okay. He told me that the inconveniences was like, you know, I was going to have to go look for me a truck, and I had to take some time off from work, and a baby sitter, that we would probably need a baby sitter, because we couldn't stay at home. And the boy was staying at my mother's, and gas and stuff like that, running around to get me another vehicle. That was the inconveniences that he talked about.
 "Q. All right. Did you have any discussions about putting in some more money concerning your truck?
"A. Yes, sir. "Q. What was said about that?
 "A. I just told him that I wanted more money for the truck. And he said, `Well, we will slip that in, we will just slip that in here and make it even Twelve Hundred Dollars.
"Q. Even Twelve Hundred?
 "A. That's right, for the inconveniences and the balance of my truck, which he had promised me before that he was paying me.
 "Q. At any time, up until the time that you signed — you and your wife signed these exhibits, being Plaintiffs' Exhibits No. 4 and 5 here, did Mr. Sanders say anything to you about Uninsured Motorist Coverage?
"A. No, sir, and I didn't even know I had it."
The State Farm Insurance agent who was present during the negotiations, testified:
 "If I am in the office I make it a practice to be in on all of the negotiations, because not only in the interest of State Farm but in the interest of the policy holders." (Emphasis added.)
The agent could not recall that "Uninsured Motorist Coverage" or "pain and suffering" were mentioned by the adjuster during the negotiations. He did state that he did not tell the insureds that they had uninsured motorist coverage.
We have set out portions of the testimony to show that the jury could have believed that State Farm intended to deceive and injure its insureds. Cf. State Farm Mutual AutomobileInsurance Co. v. Ling, 348 So.2d 472 (Ala. 1977). Whether specific conduct constitutes an intent to deceive is a jury question. Metropolitan Life Ins. Co. v. James, 238 Ala. 337,191 So. 352 (1939).
State Farm contends that the evidence was insufficient to support an award of punitive damages. We disagree.
State law required that State Farm offer uninsured motorist coverage to these insureds. The jury could have concluded that the adjuster deliberately and intentionally suppressed the fact that there was coverage for pain and suffering, loss of services and consortium, and that, under the particular circumstances, there was an intent to deceive.
AFFIRMED.
BLOODWORTH, FAULKNER, JONES, SHORES, EMBRY and BEATTY, JJ., concur.
TORBERT, C.J., dissents.
ALMON, J., not sitting.