832 So.2d 628 (2000)
COOPER & COMPANY, INC., d/b/a The Prudential Cooper & Company; et al.
v.
James LESTER et al.
1981368.
Supreme Court of Alabama.
December 22, 2000.
Rehearing Denied December 7, 2001.
*629 Edward G. Bowron, H. William Wasden, and J. Robert Turnipseed of Pierce, Ledyard, Latta & Wasden, P.C., Mobile, for appellants.
Edward G. Hawkins and Ray M. Thompson of Hawkins & Thompson, L.L.C., Mobile, for appellees.
JOHNSTONE, Justice.
Four couples sued the defendants-appellants for frauds in the sales of four homes to the respective couples, who alleged that the defendants misrepresented or suppressed an existing flood hazard, that the couples consequently bought the homes, and that floods damaged the homes. From judgments on verdicts in favor of the plaintiff couples, the defendants-appellants appeal; and we affirm, conditioned on the plaintiffs' accepting certain remittiturs.
The plaintiffs, Jeffrey Scott Willis and Sandra Willis; Stacy L. Sergeant and Laura E. Sergeant; Leslie Dwayne Woodham *630 and Nan A. Woodham; and James W. Lester and Sandra L. Lester, are the four couples who bought homes in the Sunchase subdivision. After experiencing major flooding of their homes, the plaintiffs sued Cooper & Company, Inc., d/b/a The Prudential Cooper & Company; Lloyd A. Botsford; Jordan R. Cooper; E.W. Brewer; E.W. Brewer Quality Homes; John E. Turberville; Turberville Construction, Inc.; Fred M. Smith; Fred Smith & Company, Inc.; Mikell D. Speaks; and Mikell D. Speaks & Associates Consulting Engineers, Inc. The plaintiffs alleged that the defendants either misrepresented or suppressed (or both) material facts about storm water flooding from Turkey Creek when the plaintiffs purchased their homes in the Sunchase subdivision.
Before trial, the plaintiffs entered a pro tanto settlement with defendants Fred M. Smith, Fred Smith & Company, Inc., Mikell D. Speaks, and Mikell D. Speaks & Associates Consulting Engineers, Inc., and dismissed their claims against these defendants. The case against the remaining defendants was tried to a jury in December 1998. The jury found for the plaintiffs and variously against Botsford, Cooper, and Cooper & Company. The jury found no liability on the parts of defendants John E. Turberville, Turberville Construction, Inc., E.W. Brewer, or E.W. Brewer Quality Homes. The verdicts were as follows:

Plaintiffs Defendants Compensatory Punitive
Woodham Cooper & Co. $63,887.50 $250,000
 d/b/a The Prudential
 Cooper & Company
Lester Cooper & Co. $76,460.00 $250,000
 d/b/a The Prudential
 Cooper & Company;
 and Lloyd A. Botsford
Sergeant Cooper & Co. $59,512.50 $250,000
 d/b/a The Prudential
 Cooper & Company
Willis Cooper & Co. $85,155.00 $250,000
 d/b/a The Prudential
 Cooper & Company;
 and Jordan R. Cooper

Cooper, Botsford, and Cooper & Company moved for a new trial or, in the alternative, for a remittitur. After a hearing on the motions, the trial judge issued his order upholding the jury's verdicts. The trial judge made the following findings of fact in his Hammond[1] Order:
"The plaintiffs alleged and proved that three separate incidents caused Cooper & Company, Lloyd Botsford, and Jordan Cooper (the Cooper defendants) to know about the storm water flooding problems in Sunchase prior to the relevant sales to the four sets of plaintiffs. First, on September 3, 1993, Lloyd Botsford witnessed a flood in the backyard of Lot 18 during the final walk-through inspection on a sale brokered by Cooper & Company to Chris Clements. Mr. Clements testified that a flood occurred at the *631 time of the inspection and that the water level was well above the base of several landscaped trees (see Plaintiffs' Exhibit 73). Though Mr. Botsford denied witnessing such a flood, the photograph introduced in evidence refuted the veracity of his testimony.
"Second, Cooper & Company and Mr. Botsford lost a sale of Sunchase Lot 17 due to the flooding problem. Keith Bryant testified that in December, 1993, he witnessed evidence of water ponding forty feet into the backyard of Sunchase Lot 17 when he met Mr. Botsford at that location. Due to the water problems, Mr. Bryant did not purchase the property. Consequently, Mr. Botsford knew that flooding had cost him the sale of Lot 17.
"Third, in addition to the knowledge of the Sunchase floods Cooper & Company possessed through the Clements and Bryant episodes, co-defendant Eric Brewer addressed the flooding with both Lloyd Botsford and Jordan Cooper in the fall of 1994.
"Even though Mr. Botsford had twice witnessed evidence of flooding at Sunchase, he admitted that Cooper & Company did not disclose the storm water flooding problem when it listed the lots the plaintiffs purchased in the Mobile County multi-list service. The evidence was equally uncontradicted that Cooper & Company, Mr. Botsford, and Mr. Cooper hid the flooding problem from the Cooper & Company sales agents. No one from Cooper & Companyparticularly Mr. Botsford or Jordan Cooper ever revealed the flooding problem during any of the weekly company sales meetings which Cooper & Company held for its agents.

"There was no visible evidence of flooding problems at any of the times the plaintiffs viewed the properties prior to their purchases. In fact, the evidence was uncontroverted that none of the plaintiffs knew about the flooding problem before they purchased their homes in Sunchase.

"Plaintiffs Nan and Dwayne Woodham were the first of the plaintiffs to purchase a home in Sunchase. They engaged Cooper & Company to represent them in finding a home to purchase. The evidence was uncontradicted that Cooper & Company did not disclose the flooding problem to the Woodhams prior to the closing on the sale of their property.
"Jim and Sandra Lester were the next plaintiffs to purchase a Sunchase home through Mr. Botsford and Cooper & Company. On March 2, 1994, the Lesters purchased the same Lot 17 that Mr. Keith Bryant decided not to purchase. Mr. Lester began dealing with Mr. Botsford in January, 1994, which was after Mr. Botsford lost the sale on the lot to Mr. Bryant and after Mr. Botsford witnessed the Chris Clements closing walk-through flood. Mr. Lester directly asked Mr. Botsford whether there was a problem with water in the back yard. Despite Mr. Botsford's personal, firsthand knowledge to the contrary, he misrepresented that there should not be any problem with the water and that the fifteen foot drainage easement should handle all the water. Mr. Botsford never disclosed anything regarding the two prior floods he knew about or his lost sale of the very same lot. Botsford's response was both an intentional misrepresentation and an intentional suppression.
"The Sergeants were the next plaintiffs who used Cooper & Company to find a home in Sunchase. Again the evidence irrefutably establishes that Mr. Botsford never disclosed the flooding problem to the Sergeants.

*632 "The last plaintiff family to buy a home in Sunchase through Cooper & Company was the Willis family. That sale closed on January 26, 1995. By the time of the Willis sale, Cooper & Company knew about the flooding problem from at least three different sources. Yet Jordan Cooper misrepresented to the Willises that there was no water problem affecting their lot. At the pre-closing walk-through inspection of the lot, the Willises directly asked Jordan Cooper whether there was a water problem. He denied that there was a problem, despite his prior knowledge and the prior knowledge of Cooper & Company.
"Furthermore, the record reflects the flood waters are hazardous to the plaintiffs' health and safety. For example, the force of the storm waters was so powerful that it swept a one thousand pound lawn mower from one end of the subdivision to the other. Little imagination is required to prove what such a powerful surge could do to an innocent child. Moreover, the testimony was uncontradicted that the floods smelled like sewage and left fish to rot in the plaintiffs' yards.

"In sum, the jury concluded that the misrepresentations and suppression of material facts by Cooper & Company, particularly the conduct of Lloyd Botsford and Jordan Cooper, entitled the plaintiffs to compensatory and punitive damages, and the court concurs."
(Emphasis added.)
On appeal, the defendants claim that the trial court erred in granting the plaintiffs' motion in limine to exclude the preclosing inspection forms executed by "the Willis, Woodham, and Lester plaintiffs," that the trial court erred in excusing two jurors without sufficient cause, and that the trial court prejudiced the defendants in questioning defendant Eric Brewer. Next, they claim that the trial court erred in submitting to the jury: (1) the Lesters' fraudulent misrepresentation claim against Botsford and Cooper & Company; (2) the Lesters' fraudulent suppression claims against Lloyd Botsford and Cooper & Company; (3) the Willises' fraudulent suppression claim against Jordan Cooper and Cooper & Company; and (4) the Sergeants' fraudulent suppression claim against Cooper & Company. The defendants claim also that the trial court gave erroneous instructions on fraudulent suppression. They claim further that the verdicts are inconsistent as a matter of law. Last, the defendants argue that the trial court erred in refusing to the remit the punitive damages awarded to the plaintiffs and that the trial court erred in failing to offset the verdicts with the pro tanto settlements entered between the plaintiffs and codefendants Fred Smith & Company, Mikell Speaks & Associates, and Mr. Smith and Mr. Speaks themselves. The defendants do not challenge any of the compensatory damages awards for excessiveness.

I. Issue of Plaintiffs' Motion in Limine
The defendants argue that the trial court erred in granting the plaintiffs' motion in limine and in excluding the pre-inspection indemnity agreements signed by the Willis, Woodham, and Lester couples. The defendants complain that the trial judge erred both in granting the plaintiffs' motion in limine and in sustaining the plaintiffs' objections at trial. The defendants-appellants, however, have failed to include the excluded exhibits in the record on appeal. Thus, we cannot determine whether the exhibits would have made any difference even if the rulings by the trial court were erroneous. The duty is on the appellants to include in the record on appeal those materials necessary for valid review. See Coleman v. Taber, 572 So.2d 399 (Ala.1990), Trimble v. City of Prichard, 438 So.2d 745 (Ala.1983), and *633 Elliott v. State ex rel. Outlin, 547 So.2d 566 (Ala.Civ.App.1989).

II. Issue of The Trial Court's Excusal of Two Jurors
The defendants next argue that the trial judge erred in excusing two jurors challenged for cause by the plaintiffs. Because a trial judge has broad discretion in sustaining or denying a challenge of a juror for cause, his decision is given great weight and will not be disturbed on appeal unless it is clearly erroneous and equivalent to an abuse of discretion. Roberts v. Hutchins, 613 So.2d 348 (Ala.1993). The record reflects that, on the plaintiffs' challenges for cause, the trial judge excused Juror 11, an insurance agent who represented the two insurance companies that insured the defendants in this case, and excused Juror 26, a former-real estate broker for Cooper & Company who had appraised homes in the Sunchase subdivision. The defendants have failed to show an abuse of discretion by the trial court.

III. Issue of the Lesters' Fraudulent Misrepresentation Claim
The defendants contend that the trial court erred in submitting the Lesters' fraudulent misrepresentation claim to the jury. They argue that the statements made by defendant Botsford to plaintiff James Lester constituted an opinion or a prediction of a future event, not a misrepresentation of fact. "Whether a given representation is an expression of opinion or a statement of fact depends upon all the circumstances of the particular case, such as the form and subject matter of the representation and the knowledge, intelligence and relation of the respective parties." Executive Dev., Inc. v. Smith, 557 So.2d 1231, 1233 (Ala.1990) (quoting earlier cases). Classifying a defendant's statement as an opinion is not necessarily fatal to a plaintiff's claim for fraud:
"Normally, the courts will not allow a statement of opinion to be a basis on which to predicate a claim of fraud. However, if there is proof of actual fraudulent intent at the time the representation is made and the person succeeds in the deception and injury results, an action for fraud may be predicated on such a representation, notwithstanding the opinion nature of the representation. Shepherd v. Kendrick, 236 Ala. 289, 181 So. 782 (1938); see also Army Aviation Center Federal Credit Union v. Poston, 460 So.2d 139 (Ala.1984); Clanton v. Bains Oil Co., 417 So.2d 149 (Ala.1982); Birmingham Broadcasting Co. v. Bell, 259 Ala. 656, 68 So.2d 314 (1953).
"Where the representation of an opinion is involved, a person must prove not only that there was an intent to deceive, but also that his reliance was reasonable. See Bedwell Lumber, Inc. v. T & T Corp., 386 So.2d 413 (Ala.1980). In certain situations a person may reasonably rely on the representation of an opinion. For instance, where the facts are not equally known to both sides, a statement of opinion by the one who knows the facts better, often involves a statement of a material fact that justifies his opinion, Scholz Homes, Inc. v. Hooper, 287 Ala. 628, 254 So.2d 328 (1971), quoting Kefuss v. Whitley, 220 Mich. 67, 189 N.W. 76 (1922); therefore, in such a situation, an action for fraud may be predicated on an opinion, depending on whether the reliance on the representation of the opinion is reasonable. Cf. Shepherd v. Kendrick, 236 Ala. 289, 181 So. 782 (1938); Scholz Homes, Inc. v. Hooper, 287 Ala. 628, 254 So.2d 328 (1971).
"....
"... Whether a fraudulent intent has been proven is a matter peculiarly within the province of the jury, where there *634 is evidence of such an intent. State Farm Mut. Auto. Ins. Co. v. Borden, 371 So.2d 28 (Ala.1979); Southeastern Properties, Inc. v. Lee, 368 So.2d 288, on remand, 368 So.2d 289 (Ala.Civ.App. 1979)."
Reynolds v. Mitchell, 529 So.2d 227, 231 (Ala.1988).
The record reflects that a dry creek bed for a tributary of Turkey Creek runs along the back of the lots on which the plaintiffs' homes were built in the Sunchase subdivision. Each plaintiff couple suffered three or four floods between the time the couple bought their home and the time the couple filed suit.
Plaintiff James Lester testified that in January 1994 he and his wife Sandy visited the Sunchase subdivision and noticed "open house signs." He stated that they then walked through one of the "open houses." James Lester noticed that the front and side yards of the open house had been sodded but that the backyard had not been sodded. Although James Lester did not walk in the backyard, he noticed that the backyard area was "kind of wooded and trees and brushy and those kudzu and weeds and stuff." As the Lesters walked through the open house, defendant Botsford, a one-sixth owner of Cooper & Company, approached them and visited with them for "twenty minutes." The Lesters told Botsford that the house suited them. As the Lesters and Botsford were discussing items in the house that needed to be completed, they walked out onto the back patio, where James Lester asked Botsford about the drainage of rainwater falling from the roof onto the patio and washing away dirt at the edge of the patio. In this discussion, James Lester asked Botsford "if there was a problem with water." Botsford responded, "[N]o, there shouldn't be a problem." James Lester then asked Botsford, "if there was ever a problem with water," to which Botsford replied, "there is a fifteen-foot easement back there that should handle the water." Relying on Botsford's statement that the easement should handle the drainage of rainwater, the Lesters purchased the house on lot 17.
The following facts support the jury's conclusion that Botsford intentionally misrepresented the ability of the easement to handle the drainage of rainwater from the Sunchase subdivision. In September 1993, Botsford had been questioned about flooding by Chris Clements, a prospective purchaser of the house on lot 18, on the south side of the Lesters' house. Clements had noticed the "ponding" of water that extended to a tree by the driveway close to the house. He specifically asked Botsford about flooding. Botsford told Clements that the flooding would subside "as more houses were built and the land was more developed." Relying on Botsford's representation, Clements purchased the house on lot 18.
In December 1993, Botsford tried to sell the house on lot 17, the lot that the Lesters subsequently purchased, to Keith Bryant. During a visit to lot 17, Bryant observed a "pond" in the backyard that extended approximately 40 feet toward the house. Bryant demanded a written assurance from the developer that the "swale" in the backyard would work. When he did not receive such an assurance, Bryant purchased a house and lot across the street from lot 17 and the plaintiffs' homes, on the high side of the Sunchase subdivision.
Although Botsford's statements to the Lesters can be characterized as opinions, Botsford had knowledge of flooding of lot 17 and the other lots bordering the 15-foot easement, a material fact, not known to the Lesters or the builder of the Lesters' house. The Lesters presented substantial evidence from which the jury could have concluded that Botsford gave *635 his opinion with the intent to deceive and that the Lesters' reliance on his opinion was reasonable. See Reynolds, supra. Therefore, the trial court did not err in submitting the Lesters' fraudulent misrepresentation claim to the jury. Id.

IV. Issue of the Trial Judge's Questioning of Defendant Brewer
The defendants argue that the trial judge erred in questioning Eric Brewer, a defendant and a witness. The record reflects that the trial judge gave the jury the following curative instruction before questioning Brewer:
"THE COURT: Ladies and gentlemen, let me tell you this. Under the rules of evidence a Judge is permitted to ask questions. However, it is important for you to remember that simply because a Judge asks questions it does not in any way, shape or form, suggest, indicate, or otherwise deliver any message to you about my opinion [as] to the facts because, like I told you yesterday, I am not permitted to have an opinion about the facts."
The trial judge then asked Brewer a question. The next morning the trial judge gave the following additional curative instruction:
"THE COURT: Good morning. Okay. In all seriousness before we get started today, yesterday I asked a question of Mr. Brewer which related to an alleged conversation with Mr. Botsford concerning the Lester property. It is a rule of law that the question must be based on facts in evidence, and in going through my notes both last evening and this morning I have concluded that I made a mistake because there was no factual basis for me to ask that question. I think it would compound the mistake to get into the details of the question and the response, but as a bottom line proposition I made a mistake when I asked Mr. Brewer about a conversation with Mr. Botsford, which according to the present posture of the evidence never took place. So, I ask that, both the question, if you remember it, and the answer, if you remember it, be disregarded by each and every one of you."
The judge then asked: "Is there anyone who cannot disregard both the question and the answer?" No juror responded. The defendants neither requested a further curative instruction nor moved for a mistrial.
A judge has a right to propound questions to witnesses as may be necessary to elicit certain facts, if he or she deems it necessary to elicit proper evidence bearing on the issues. Rice v. Hill, 278 Ala. 342, 178 So.2d 168 (1965). Dean Gamble notes that the case of Affiliated FM Ins. Co. v. Stephens Enterprises, 641 So.2d 780 (Ala.1994), suggests that any inappropriateness in a trial judge's questioning may be lessened by a curative instruction informing the jury that the judge has no feelings about the case. Charles W. Gamble, McElroy's Alabama Evidence § 121.04(2), n. 7. (5th ed.1996). This trial judge gave the proper curative instruction and did not abuse his discretion in this case.

V. Issue of Fraudulent Suppression
The defendants claim that the trial court erred in submitting to the jury: (1) the Lesters' fraudulent suppression claims against Lloyd Botsford and Cooper & Company, (2) the Willises' fraudulent suppression claim against Jordan Cooper and Cooper & Company, and (3) the Sergeants' fraudulent suppression claim against Cooper & Company. The defendants claim also that the trial court gave erroneous instructions on fraudulent suppression.
*636 The issue of fraudulent suppression is governed by State Farm Fire & Casualty Co. v. Owen, 729 So.2d 834 (Ala.1999):
"Under our interpretation, the trial [judge] must ask himself or herself, `Is there substantial evidence which if accepted by the jury would give rise to a duty to disclose as a matter of law?' If the answer is yes, then the trial [judge] should charge the jury in accordance with the following suggested revision of [Instruction 18.08, Alabama Pattern Jury Instructions: Civil (2d ed.1993)],... which revision we recommend for the Pattern Jury Instruction Committee's consideration:

"`SUPPRESSION OF TRUTH DUTY TO DISCLOSE
"`The plaintiff contends that the defendant was guilty of a legal fraud because the defendant (concealed) (withheld) material facts from the plaintiff and without knowledge of such material facts the plaintiff acted to his injury. The defendant denies those allegations and, therefore, the burden is upon the plaintiff to reasonably satisfy you from the evidence of the truthfulness of each of the following claims:
"`1. That the defendant (concealed) (withheld) material facts from the plaintiff to induce the plaintiff to act; and
"`2. That without knowledge of such material facts the plaintiff acted to his injury.
"`In determining whether the plaintiff has sustained the foregoing burden, you may consider the value of the particular fact(s) involved, any inequality of the condition of the parties, and whether the defendant has some particular knowledge or expertise not shared by the plaintiff.'"
729 So.2d at 841-42. With regard to a seller or a seller's agent's duty to disclose defects in residential real estate, this Court has held:
"In Alabama the seller of used residential real estate generally has no duty to volunteer knowledge; however, when a direct inquiry is made of him or her, the seller has a duty to respond honestly. However, if the seller, or the seller's agent, is questioned directly about specific defects, or if the seller or the agent has knowledge of specific defects that affect health or safety and the defect is not known to or readily observable by the buyer, the seller or the agent has a duty to disclose and is liable for damages for nondisclosure." (Emphasis added.)
Roberts v. C & S Sovran Credit Corp., 621 So.2d 1294, 1297 (Ala.1993) (citations omitted).
"Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." § 6-5-102, Ala.Code 1975. See also § 6-5-103 and § 6-5-104, Ala.Code 1975.
In this case the plaintiffs purchased new homes directly from the builder of the homes. See Cochran v. Keeton, 287 Ala. 439, 252 So.2d 313 (1971) (this Court abrogated the caveat emptor rule in sales of new residential real estate by a "builder-vendor"). Therefore, because each of the homes being sold was new, the abrogation of the caveat emptor rule strengthens the duty of a seller or a seller's agent to disclose defects affecting health and safety.

What the Defendants knew
Jordan Cooper, a profit-sharing employee of Cooper & Company, testified that, when he drove by the Sunchase subdivision, he noticed that the developer had *637 put up a sign advertising lots for sale. After several conversations with the developer, Cooper obtained "a listing" of the subdivision for Cooper & Company. Cooper recommended to the developer that the developer and Cooper & Company obtain four or five good builders to work in the subdivision. Each builder started with three lots on which to build houses.
Cooper visited the Sunchase subdivision on a regular basis. On several occasions, he noticed water running across the backyards of the properties along the easement. Cooper testified:
"The way this subdivision was set up and the runoff of water and so forth, the backyard was going to be where the watershed was. I mean, the lay of the land. It's just the house is up high, then it goes down and it [just] flattens out. With a berm in the back, if it rains it's got no place to go but the backyard...."
Cooper admitted that, when he was marketing the lots to the builders and to the plaintiffs, he knew:
"The drainage easement would not handle [the rain] because the drainage easement is only fifteen feet and the lay of that land, anytime you have a light rain, its going to extend beyond that. It was designed that way."
He acknowledged that the flooding of the plaintiffs' properties could affect their health and safety. Cooper admitted that, when the plaintiffs purchased their houses and lots, the plaintiffs would not have been able to see any problems with water in the easement overflowing into the backyards. He admitted further that neither he nor Botsford told any of the agents of Cooper & Company about the "potential water problems or water problems at Sunchase [subdivision]." Cooper stated also that Botsford never told him about any water problems at the Sunchase subdivision.
Botsford testified that Jordan Cooper had a listing agreement with defendant Turberville, one of the builders in the Sunchase subdivision. Botsford stated that he had the listing agreement with defendant Brewer, another of the builders in the Sunchase subdivision.
Botsford admitted that, in September 1993, during a final walk-through of the house on lot 18, he and the prospective purchaser Chris Clements noticed the "ponding" of water in the backyard. Botsford denied that the easement had flooded the backyard of lot 18. Clements testified that, at the time of the final walk-through of the house on lot 18, there was, in the backyard, rapidly flowing water extending to a tree by the driveway, well beyond the confines of the easement. When Clements asked Botsford about the flooding, Botsford told him that the flooding would subside "as more houses were built and the land was more developed," and that the flooding would subside as soon as the rest of the subdivision was landscaped. Lot 18 adjoins lot 17 on the south side of the Lesters' house and lot.
In December 1993, Botsford tried to sell the house on lot 17 to Keith Bryant. Botsford admitted that Keith Bryant refused to purchase lot 17, but denied that Bryant refused to purchase the lot because the easement flooded the backyard during Bryant's inspection of the house and lot. Bryant testified that, while visiting the house on lot 17, he noticed dampness in the backyard and told Botsford he wanted to return to the property after it rained. Bryant revisited the property in December 1993 after a rain. He stated that he observed in the backyard a "pond" of water extending approximately 40 feet toward the house. Bryant then asked Botsford for a written assurance from the developer that "the berm" at the back of lot 17 worked. He testified that he did not receive *638 a written assurance from the developer or Botsford, so he bought a house on the high side of the subdivision across from lot 17 and the plaintiffs' other properties. In the fall of 1994, after the plaintiffs-Sergeants complained to Brewer about a "flooding defect," Brewer discussed the "flooding problems" with Botsford, Cooper, the developer, and the engineer for the subdivision.
Botsford admitted that, even after witnessing the flooding or the "ponding" on lot 18 during the preclosing walk-through with Clements, Cooper & Company did not disclose on the multi-listing information any flooding or "water" problems in the Sunchase subdivision. He stated that the multi-listing information is for the use of real estate agents "so that all the agents have the information about the property."
The foregoing facts establish that the defendants knew that the 15-foot easement contained a dry creek bed intended by the developer to drain rainwater from the subdivision and that the easement could not handle the rainwater draining from the subdivision. Further, it is undisputed that the defendants did not disclose the drainage problem to the individual builders or the plaintiffs.

The Woodhams
The Woodhams, Leslie and Nan, purchased their house and property on lot 15 on January 10, 1994. Robin Blake of Cooper & Company represented both the seller and the Woodhams in the sale of the property. The Woodhams did not ask about flooding before purchasing their property. However, the defendants do not contend that the trial court erred in submitting the Woodhams' fraudulent suppression claims to the jury.

The Lesters
As previously stated in this opinion, before making the purchase agreement for lot 17, James Lester specifically asked Botsford "if there was a problem with water," and if there was ever a problem with water. Botsford replied, "[N]o, there shouldn't be a problem." Botsford never told the Lesters about the "ponding" that he had seen on Lot 17 in December 1993.
During one of the numerous floods of the Lesters' property, the Lesters' 12-foot-by-12-foot utility shed containing a 900 to 1,000 pound riding lawn mower, tools, and some of James Lester's work files floated down the street and into the holding pond. James Lester had to return home from a job in Louisiana to have his utility building and riding lawn mower pulled out of the holding pond.
During another flood, water overflowing from the easement damaged the framing and vinyl siding of the Lesters' carport. Additionally, water seeped under the vinyl siding and damaged the drywall under the vinyl siding. James Lester testified that the estimated cost of repair of the carport was between $1,100 and $1,200.
Sandy Lester testified that Botsford did not tell her about a flooding problem before she and her husband purchased their house. Sandy testified that water from the easement travels from the backyard around both sides of the house to the front yard. She stated that water from the easement has reached the front door of her house and has transported debris to her front yard.

The Sergeants
In February 1994, plaintiffs Laura Sergeant and Stacy Sergeant drove to the Sunchase subdivision to look for a house. They drove to a house with an "open house" sign. They stopped and went inside the house, where Botsford greeted them. Botsford was wearing a "Prudential Cooper" badge. Botsford showed the Sergeants several lots and the house on lot 14. The Sergeants were interested in the house on lot 14. Botsford arranged for *639 the Sergeants to meet with the builder for lot 14, Eric Brewer.
The next day, the Sergeants, Botsford, and Brewer met at the house on lot 14. They discussed the house plans, the square footage of the house, and the sales price of the house. Laura testified that she and Stacy were shown "a piece of paper showing the lot itself and there were two easements present on the lot." One easement was a five-foot utility easement on the front of the property. The second easement was "a ten-foot easement in the back that said drainage easement across it." Laura testified that, when she asked Botsford and Brewer the purpose of the drainage easement, either Botsford or Brewer told her that the purpose of the drainage easement "was to collect water that drained down our lot from rain to the back of the property rather than keeping it in the yard. And then the same way for all the homes on that side of the street." Laura stated that neither Botsford nor Brewer told her or Stacy that the lot would flood. She stated further that she and Stacy would not have bought the house on lot 14 had they known about the flooding problem.
Laura testified that, when their property first flooded in September 1994, she, from the back porch, could hear the water rushing. Laura described the water as extremely swift with white foam, white water, and a sewage smell. The water moved so swiftly that it washed away big stumps. Laura said that, at times, after a rain, she and passersby could smell sewage in front of her home. She said that water extended beyond the easement to within four feet of the corner of her house and that the water was about two feet deep on most occasions.
Laura stated that she and her husband wanted to erect a fence around their property. After the September 1994 flood, Laura telephoned Brewer about the flooding and about erecting a fence around her lot. Brewer referred her to Cooper & Company. Laura telephoned Jordan Cooper and asked him about erecting a fence around her property. Cooper told Laura that he would not recommend erecting a fence at that time because "[t]hey still hadn't cleared out lot sixteen. There was some kudzu in the back of the lot and ... when they finished building on that property that the problem should be gone." After watching their neighbors' fences rot and wash away during floods, the Sergeants decided not to erect a fence around their property.
Laura stated that, after the water from a rain recedes from her backyard, she has noticed dead, smelly fish in her backyard. She has noticed that the dead, smelly fish attract cats to her backyard. Laura has noticed that, after a rain, frogs, too, are attracted to her backyard, where they lay eggs. Because puddles remain in the backyard, it takes days or weeks to dry out, and during this time the frog eggs hatch and grow into tadpoles. The tadpoles live for some time, until the sun dries up the puddles. The tadpoles then die and smell. Laura described the smell of her backyard after a rain as "[i]f you have left shrimp or whatever in the garbage can too long it kind of has a real foul odor and it smells like that and the grass smells that way." She further described her backyard as "like mush," so that a person cannot walk in the backyard without sinking into the ground.
To avoid erosion, the Sergeants spread a load of topsoil in their backyard. Stacy Sergeant staked three railroad crossties with three-foot metal rods along the easement in the Sergeants' backyard. However, water from the easement washed away the railroad crossties. Stacy Sergeant then staked landscaping timbers two-high along the easement. Again, water from the *640 easement washed away several of the landscaping timbers.

The Willises
Plaintiff Sandy Willis testified that Hope Downing, a real estate agent with Cooper & Company, showed her and her husband Scott a house in the Breckenridge subdivision, where they did not buy. In December 1994 or January 1995, Downing telephoned Sandy and told her that Cooper & Company had some houses within the Willises' price range in the Sunchase subdivision. Sandy arranged to meet Downing the next day at the Sunchase subdivision. Sandy then telephoned Scott and asked him to go by the Sunchase subdivision and look at the houses. Scott brought home fliers of the homes for sale in the Sunchase subdivision. Sandy and Scott met Downing at the Sunchase subdivision, where they walked through a house. Sandy and Scott both testified that they did not see any evidence of flooding when they visited the house they eventually purchased. They did notice debris and a hump or a "berm" in the backyard. Sandy and Scott contracted with the builder, Turberville, to purchase the house on lot 16, which is between the lots owned by the Lester and Woodham families. They conditioned their purchase of the house upon Turberville's leveling the backyard and clearing trash from the backyard.
Sandy and Scott attended a preclosing walk-through of the house. Cooper and Turberville were present at the preclosing walk-through. At that time, Sandy and Scott asked Turberville if he could lower the berm more because they wanted to erect a fence around the backyard. Turberville, with Cooper standing next to him, stated that he could not further lower the berm because the berm controlled the water. Sandy and Scott asked if there was a "water problem." Turberville stated that there was not a water problem. He explained how rainwater from the houses above their property in the Sunchase subdivision would drain in the easement. Sandy testified that Cooper agreed with Turberville's statements and said there "was not a water problem." Cooper did not tell the Willises at the preclosing walk-through about the easement. Likewise, Cooper did not tell them about the water that had flowed through their backyard. On January 26, 1995, the Willises closed their purchase on the house on lot 17.
Sandy testified that she did not know about the 15-foot easement across her backyard until after she and Scott bought their house. Sandy and Scott erected a wooden fence around their property. However, they had to move the back fence forward several feet because fast-flowing rainwater had lifted and loosened the fence bottom. Even after Sandy and Scott moved the fence forward further into their backyard, fast-flowing water overflowed the easement, lifted the fence, and pulled boards off the fence. Eventually fast-flowing rainwater washed away the concrete anchors of the fence posts and, on one side of the property, moved the fence into the neighbors' yard.
During a March 1995 flood, the water overflowing from the easement flowed halfway up in the Willises' backyard. Sandy stated that the water sounded like "a creek running." Further, according to Sandy, water ran through her backyard every day from November 1997 until January 1998. Every day from November 1997 until January 1998 the Willises' backyard smelled like a sewer or dead fish.
In January 1998 water overflowed the easement again. As the water crept closer to the Willises' house, Sandy and Scott moved their cars up on a hill. The water circled the house and seeped in under the front door and the back door of the house. The water flooded the patio and washed away chairs, "boilers," a barbecue grill, *641 and a garbage can. The water filled the empty swimming pool. Sandy testified that, when her daughters went outside to get the "boilers," her daughters could have been washed away by the water. The Willises had a major clean-up after the water subsided.
The Willises' property flooded still again one night in March 1998. Sandy videotaped the flood. Water seeped in under the back door of Willises' house and seeped into the back foyer. Sandy and her family used towels and blankets to keep the water from seeping into any other room. The easement overflowed next on July 26, 1998. Sandy again videotaped the flood. Sandy testified that the July 1998 flood was not bad, but that the creek was "out" of the easement and into her backyard. The easement next flooded on September 28, 1998. The jury viewed videotapes of the March 1998 and July 1998 floods.

VI. General Analysis of Proof of Fraudulent Suppression
The trial judge's findings of fact and the evidence of record itself establish that defendant Botsford knew there was a flooding problem. Botsford had personally witnessed the flooding of lot 17 and he had lost a sale of lot 17 as a result of flooding just one month before the Lesters inquired about any "water problems" with that lot. All of the witnesses unanimously testified that the flooding defect was not apparent to the plaintiff purchasers. Moreover, during Sandy Willis's testimony, defense counsel conceded that Sandy Willis's testimony "goes to suppression ... suppression that, yes the allegation is we knew there was substantial floods before this and we didn't tell her, I agree, she cannot, `As is,' accept to something she was not told of."
The trial court concluded that the flooding of the plaintiffs' property constituted a defect affecting health and safety. We agree that the swiftness of the water flowing in and out of the easement; the washing of fish, which died, and of other debris into the plaintiffs' yards; the attraction of frogs into the plaintiffs' backyards and the breeding of tadpoles and frogs which died there; and the strong smell of sewage or dead fish, constitute a defect affecting the health and safety of the plaintiffs. Further, it is undisputed that the plaintiffs did not know of, and could not have known of, the flooding defect. The plaintiffs presented substantial evidence that the defendants knew of and concealed the flooding defect. Thus, the trial court properly submitted the plaintiffs' fraudulent suppression claims to the jury. C & S Credit Corp. of Alabama, supra.

VII. Issue of the Fraudulent Suppression Instructions
Next, the defendants contend that they are entitled to a new trial on the ground that the trial judge gave erroneous instructions on fraudulent suppression. In reviewing the trial court's instruction to the jury, this Court reads and considers the entire charge as a whole. Baptist Mem'l Hosp. v. Bowen, 591 So.2d 74 (Ala. 1991). There were four couples as plaintiffs, each with different claims. The trial judge took care to avoid confusion among the different claims. The trial judge dealt with the fraudulent suppression claim by adapting Alabama Pattern Jury Instruction 18.05, entitled "Suppression of Truth." With regard to the fraudulent suppression claim of the Willises, the trial judge charged:
"If you are reasonably satisfied from the evidence that the flooding was and is a material defect or condition affecting the health and safety of the residence of the Willis home and that any of the Defendants, Jordan R. Cooper and the Prudential Cooper and Company knew about the defect before Mr. and Mrs.

*642 Willis bought their home, that such Defendants concealed the fact of the flooding from Mr. and Mrs. Willis, and Mr. and Mrs. Willis did not know about the flooding when they decided to buy their home, then such of those Defendants that knew about that defect before Mr. and Mrs. Willis bought their home, and such of those Defendants that concealed the fact of the flooding from Mr. and Mrs. Willis would be guilty of a legal fraud."
The trial judge gave similar charges on fraudulent suppression for each of the claims of the other plaintiff-couples. The defendants contend also that the trial judge gave a confusing charge as to the general fraud count. Having carefully reviewed the entire jury charge, we hold that the trial judge did not err in its charge to the jury: when read in its entirety, the charge was neither confusing nor misleading. Baptist Mem'l Hosp., supra.

VIII. Issue of Inconsistent Verdicts
The defendants argue that the verdicts returned by the jury are inconsistent as a matter of law because the jury returned a verdict in favor of all the plaintiffs and against defendants Cooper & Company, Jordan R. Cooper, and Lloyd Botsford but in favor of defendants John E. Turberville, Turberville Construction, Inc., E.W. Brewer, and E.W. Brewer Quality Homes. The defendants contend that the verdicts are inconsistent because witnesses testified that both defendant John E. Turberville and defendant Eric Brewer made misrepresentations.
The findings of the jury are not inconsistent. Within its prerogative, the jury could have disbelieved evidence offered against some defendants and believed evidence offered against others and likewise could have found differing tendencies in the evidence. See Courtesy Ford Sales, Inc. v. Clark, 425 So.2d 1075, 1077-78 (Ala. 1983). The record establishes that, although Botsford and Cooper, and through them Cooper & Company, knew of the inadequacy of the easement and the likelihood of flooding of the lots along the easement, these defendants did not tell Turberville or Brewer of the inadequacy of the easement when they brokered the sale between the developer and Turberville and the sale between the developer and Brewer. There was a great deal of difference in the evidence as to the fraudulent involvement of Botsford, Cooper, and Cooper & Company on the one hand and the evidence as to the fraudulent involvement of Turberville and Brewer on the other hand. There was substantial evidence that Botsford, Cooper, and Cooper & Company were involved at all stages of the subdivision marketing. Botsford, Cooper, and Cooper & Company marketed the Sunchase lots to builders and then again marketed the same lots to the plaintiffs. The jury's verdict against Botsford, Cooper, and Cooper & Company but in favor of Turberville and Brewer was not inconsistent. Clark, supra.

IX. Issue of Remittitur of Punitive Damages
The defendants argue that the trial court erred in refusing to order a remittitur of the verdict. The trial judge in his Hammond order reviewed the jury verdict, using not only the three guideposts set out by the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), but also applying the factors set forth in Green Oil Co. v. Hornsby, 539 So.2d 218, 223-24 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986):

"A. The BMW Guideposts

"1. The reprehensibility of the defendants' conduct.
"In BMW I, the Court opined the most important indicium of the reasonableness *643 of punitive damage awards is the degree of reprehensibility of the defendant's conduct. See BMW, 517 U.S. at 575, 116 S.Ct. 1589. The [U.S.] Supreme Court did not provide any particular standard to measure reprehensibility; however, it recognized that trickery and deceit are more reprehensible than negligence, and that acts of affirmative misconduct such as making deliberate false statements, are more reprehensible than making an innocent misrepresentation. Life Insurance Company of Georgia v. Parker, [726 So.2d 619 (Ala.1998)]. In this case, the Court finds from the evidence a clear pattern of deceit and deliberate misrepresentation by the defendants, Cooper & Company, Lloyd Botsford, and Jordan Cooper, which induced the plaintiffs to purchase the subject property.
"The facts proved that Cooper & Company and its agents had ample notice of significant flooding in the Sunchase subdivision well in advance of the transactions at issue. The evolution of the evidence then goes on to establish that, notwithstanding said knowledge, Lloyd Botsford and Jordan Cooper withheld this vital information from their own sales staff, the plaintiffs, and with regard to the Lester and Willis transactions, even made express fraudulent representations.
"The reprehensibility of the defendants' conduct certainly supports the jury's punitive damage awards.
"2. The ratio of punitive damages to the amount of actual or potential harm suffered by the plaintiffs.
"A second indicium of either reasonableness or excessiveness is the ratio of the punitive damage award to the actual harm inflicted upon the plaintiff. Parker, [726 So.2d 619]. At the hearing on March 8, 1999, the defendants conceded that they did not challenge the ratio of the compensatory to punitive damage awards. Accordingly, this factor weighs against a finding that the punitive damage awards were excessive.
"3. Sanctions for comparable conduct.
"A third indicium of the reasonableness or excessiveness of the jury's verdict is a comparison of the amount of the punitive damage award with any civil or criminal penalties that could be imposed for comparable conduct. BMW I, 517 U.S. at 583, 116 S.Ct. 1589. There are no comparable penal sanctions or civil sanctions. Section 34-27-36(a) and (a)(2) of the Code of Alabama (1975) permit the Real Estate Commission, whose role is to monitor the activities of its brokers in real estate transactions, to revoke a broker's licenses and/or fine the broker for making a material misrepresentation, or failing to disclose to [a] potential purchaser any latent structural defect or any other defect known to the broker, salesperson, or company.
"An administrative slap on the wrist does nothing to make the plaintiffs whole, nor adequately punishes the wrongdoer. This element supports a finding that the punitive damage awards were not excessive.
"4. Summary of BMW I analysis.
"Analyzing the facts of this case within the conceptual framework of BMW I leads this court to conclude that the amount of punitive damages is not excessive. The defendants, motivated by greed, engaged in a pattern of trickery and deceit, not negligent conduct. The only meaningful remedy available to the plaintiff is punitive damages, and the ratio of punitive to compensatory damages certainly conforms to the mandates of the Alabama Supreme Court.

"B. The Hammond/Green Oil Factors

"1. The punitive damage award and the actual or likely harm.

*644 "The actual harm caused by the defendants' conduct is substantial, and the amount awarded by the jury to punish the wrongdoer and deter future avarice is appropriate. Four families bought homes which either cannot be resold or, if resold, could only bring an amount far less than what they paid. Furthermore, during periods of heavy rain, they live in the midst of raging waters which pose obvious threats to their property and their physical safety. These factors weigh in favor of the size of the punitive damage awards.
"2. The reprehensibility of the defendants' conduct.
"As previously stated, this Court indeed finds the conduct of the defendants to be reprehensible because the evidence irrefutably establishes that their conduct was the product of trickery and deceit. The record is devoid of a single innocent misrepresentation. This factor weighs heavily in favor of the size of the punitive damage awards.
"3. The defendants' profit from their misconduct.
"This Court must determine if the culpable conduct was profitable to the defendants, and ensure that the defendants suffer a loss in excess of their profit. Green Oil, 539 So.2d at 223. The evidence illustrates that the defendants profited in the amount of $15,105.00 from commissions on the sales broken down as follows: Willises $4,250.00; Sergeants$3,628.00; Woodhams $3,835.00; and Lesters $3,395.00. These amounts show that the profit resulting from the defendants' fraud was modest. This factor, therefore, weighs against the imposition of a substantial punitive damage award.
"4. The defendants' financial position.
"The parties have not addressed the issue of the adverse effect this judgment will have on the defendants. The defendants' insurance policy provides for coverage up to the policy limits of $100,000.00 per wrongful act; $300,000.00 aggregate; and a supplemental policy of $1,000,000.00 excess. This factor weighs against a finding that the punitive damage awards were excessive.
"5. The costs of litigation.
"The Court shall consider the collective costs of litigation to encourage plaintiffs to bring wrongdoers to trial and to reward the plaintiff's counsel for assuming the risk of bringing the lawsuit. [Parker, 726 So.2d at 624 (citing] Green Oil, 539 So.2d at 223). The record before the Court shows that the case against the defendants took roughly twenty-nine months to come to trial after the case was filed. Further, pre-trial discovery involved approximately 18 depositions and the retention of an expert witness. The trial lasted a full seven days. The plaintiffs irrefutably incurred substantial expenses in litigating this case, supporting a finding that the award of punitive damages is not excessive under this factor. Under Parker, this factor weighs against a finding that the punitive damage awards were excessive.
"6. Criminal sanctions.
"For reasons previously stated, no criminal sanction is available to the plaintiff. Moreover, this factor is inapplicable here as the record before the Court indicates that the defendants waived consideration of the criminal sanction Hammond/Green Oil factor. This factor weighs against a finding that the punitive damage awards were excessive.
"7. Other civil actions.
"The record before the Court does not indicate that the defendants have similar cases pending. A similar type case was tried before this Court in January of *645 1999 with the jury finding in favor of the defendants. Following Parker, this factor weighs in favor of finding the award of punitive damages excessive.
"8. Summary of the Hammond/Green Oil factors.
"After analyzing the factors articulated by Hammond, 493 So.2d 1374, and Green Oil, 539 So.2d 218, this Court concludes that five of the factors weigh in favor of the jury's award of punitive damages, and two factors weigh against it.
"IV. CONCLUSION

"The assessment of punitive damages should be made with a view towards punishing the defendant, deterring others from similar conduct, and vindicating the public. Fuller v. Preferred Risk Life Ins. Co., 577 So.2d 878 (Ala.1991). The number of factors supporting the jury's award of punitive damages in this cause significantly outweighs the single factor in opposition. Moreover, this Court does not arrive at its conclusion because of simple arithmetic. Each factor is carefully weighed in light of the evidence and the mandates of precedential authority.
"The weighing of these factors is the salient concern, and the most consequential component of this Court's legal calculus is the reprehensibility of the defendants' conduct, which, at the risk of redundancy, reveals a pattern of trickery and deceit.
"Accordingly, after due consideration of the evidence and applicable precedential authorities, this Court determines that the punitive damages awarded in this case were not excessive and affirms the verdict of the jury."
After a thorough examination of the record in this case, including the evidence produced in the post-verdict Hammond hearing, we conclude that the respective punitive damage awards of $250,000 each to three of the four plaintiff-couples exceed what the tests of BMW of North America, Inc. v. Gore, supra, allow. To pass the tests, these three punitive damage awards must be remitted by the respective sums stated in the table below:

Plaintiffs Punitive Award Remittitur Remaining Pun. Award
Woodham $250,000 $58,337 $191,663
Lester $250,000 $20,620 $229,380
Sergeant $250,000 $71,462 $178,538

The remainders of these three reduced punitive damage awards, together with the punitive damage award in favor of the Willises, which is not excessive, together with the respective compensatory awards in favor of the four sets of plaintiffs, adequately punish the defendants and should deter similar conduct.

X. Issue of The Pro Tanto Settlements
The defendants contend that the verdict is due to be remitted by the $17,500 total of the pro tanto settlement entered between the codefendants Fred M. Smith, Fred Smith & Company, Inc., Mikell D. Speaks, and Mikell D. Speaks & Associates Consulting Engineers, Inc., and all of the plaintiffs. The plaintiffs have admitted that the pro tanto settlement should be applied to the verdicts. The defendants are entitled to a $17,500 setoff for the pro tanto settlement between the plaintiffs and the settling defendants.

Conclusion
We affirm the judgment of the trial court on the following conditions: (1) the *646 trial court must remit the plaintiffs' compensatory damages by the amount of the pro tanto settlement; (2) each affected plaintiff-couple must file with this Court an acceptance of the remittitur of that couple's punitive damage award specified in the table in Part IX above; (3) these actions must be accomplished within 21 days following the date of our certificate of judgment. In the absence of any affected couple's acceptance of the specified remittitur of punitive damages, the judgment on that couple's claims will be reversed and that couple's claims will be remanded for a new trial.
AFFIRMED CONDITIONALLY.[*]
MADDOX, HOUSTON, SEE, LYONS, and ENGLAND, JJ., concur.
HOOPER, C.J., dissents.
HOOPER, Chief Justice (dissenting).
I have several concerns with the main opinion, chief of which is the manner in which the main opinion has ignored recent precedent of this Court dealing with the manner in which a trial judge should instruct a jury as to the "duty" element of a fraudulent-suppression claim. I will first address some aspects of the evidence that the main opinion ignores when discussing the facts.
The defendants testified that even though they had seen water pooling in the backyards of the homes in question, they did not necessarily understand that to mean that the buyers would face flooding problems. They said none of the pooling water they had seen threatened the homes in question. Also, on one occasion when Botsford and Turberville witnessed "ponding" of water in the backyard of lot 17, the lot later purchased by the Lesters, the water was not flowing through the backyard and was only a couple of inches deep. The backyard was not complete at the time they viewed it because it had not been graded toward the back drainage easement. Therefore, the yard, consisting of clay, would have held water rather than allowing it to drain properly. The main opinion simply recites the facts as stated by the trial judge, and that statement does not take into account the entire record of the evidence from the trial.
Section 6-5-102, Ala.Code 1975, states the requirements for a finding of a duty on the part of a defendant to disclose information:
"Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
It is clear that the defendants had no duty based on confidential relations with the plaintiffs, because the defendant agents represented the sellers, not the buyers, in these transactions. The purchase agreements the plaintiffs signed, and which Botsford reviewed with them line by line, *647 stated that Cooper and Company represented the seller in the realty transaction.
I also question the impression the trial judge may have given the jury by some of his comments and questions before the jury. For example, at one point he stated:
"And I'm gonna say one thing to all of these witnesses. Y'all came in here to tell the truth and the whole truth, not to dance around the head of a pin. And if anybody starts to shuck and jive tomorrow, I will send that jury out and we are going to have a potential problem with contempt. Cause I believe very strongly that some of these witnesses came specifically Mr. Botsford and Mr. Brewer came perilously close to crossing the line today. And if they testify tomorrow, they will be held to the letter of their oaths."
The next day the trial judge admitted he had made an error regarding an alleged conversation between Botsford and Lester, but the trial judge's attempt to correct the error dealt only with that specific fact and not his entire demeanor and many statements and questions to the witnesses and attorneys for the defendants. The jury, not the trial judge, is responsible for determining the credibility of the witnesses for each party. The Committee Comments to Rule 614, Ala.R.Evid., state:
"The trial judge may not question a witness in such a way as to indicate partiality for a party or as to indicate the judge's own feelings with regard to the credibility of a witness. To do so is to abandon the proper judicial role, by taking on the profile of an advocate; to do so would be an abuse of discretion and could lead to a reversal on appeal."
From the trial judge's questioning and from other comments that appear in the record, I think the trial judge crossed the line and appeared to favor the plaintiffs quite strongly, even going so far as to accuse the defendants' witnesses of lying under oath, or at least of intending "to shuck and jive" on the witness stand.
The last error I will refer to, and perhaps the most egregious, is the majority's failure to properly apply the holding and rationale of State Farm Fire & Casualty Co. v. Owen, 729 So.2d 834 (Ala.1999), a case in which this Court stated in the clearest of terms the roles of the trial judge and the jury in determining the duty of a defendant in a fraudulent-suppression case. This Court went so far as to suggest a revised Instruction 18.08 of Alabama Pattern Jury Instruction: Civil (2d ed.1993) to assist the bench in the future. The key statement from State Farm that applies to the present case is this:
"Where the relationship of the parties from which a duty to disclose arises is not a jury issue (generally where confidential or fiduciary relations are involved), APJI 18.05 should be given instead of this charge [18.08, APJI]. It would not be appropriate to give both charges in the same case."
729 So.2d at 842 (quoting the Court's proposed "Notes on Use" to accompany a revised Instruction 18.08). Yet the trial court gave both instructions in this case. The effect of the manner and order in which the trial judge gave these instructions was to remove from the jury's deliberations the question whether there had been a confidential relationship between the Cooper defendants and the plaintiffs, something that is the duty of the jury to decide, and to allow the jury to determine whether the Brewer and Turberville defendants had a duty to disclose, something that is the duty of the trial judge to determine. Such confusion created by the instructions clearly would have prejudiced the defendants in this case.
Also, even if I agreed that the problems related above were insufficient to require a new trial of this case, I would still dissent *648 from the remittitur order because even as remitted the awards would still be excessive. The defendants' behavior was not reprehensible. The remittiturs ordered are inadequate. If this Court's purpose is to destroy the real-estate business with this case and others, then it is doing a good job. See Prudential Ballard Realty Co. v. Weatherly, 792 So.2d 1045 (Ala. 2000).
The purpose of punitive damages is to deter, not to destroy. Haynes v. Alfa Fin. Corp., 730 So.2d 178, 185 (Ala.1999) (Houston, J., concurring specially); American Pioneer Life Ins. Co. v. Williamson, 704 So.2d 1361, 1366 (Ala.1997); BMW of North America, Inc. v. Gore, 701 So.2d 507, 513 (Ala.1997); Ayres v. Lakeshore Community Hosp., 689 So.2d 39, 41 (Ala. 1997); Smith v. Schulte, 671 So.2d 1334, 1346 (Ala.1995); Patel v. Patel, 708 So.2d 159, 161 (Ala.1998); Ridout's-Brown Serv., Inc. v. Holloway, 397 So.2d 125, 127 (Ala. 1981) (Jones, J., concurring specially).
It appears that time can have a deleterious effect upon a court's resolve to comply with Supreme Court precedent. Since the United States Supreme Court issued its opinion in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), we have seen punitive damages decrease in cases where they should have decreased. Now we see them increasing, as if the courts have forgotten that excessive punitive-damages awards are not simply a mistake on the part of a jury or trial judge but are, according to the United States Supreme Court, a violation of the right to due process. As the United States Supreme Court stated in BMW: "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect `the enormity of his offense.'" 517 U.S. at 575, 116 S.Ct. 1589.
As in BMW, the damage in this case was mainly economic in nature, and the defendants in this case did not have knowledge of actual flooding; if anything, they had knowledge of some pooling in the backyards. And even that knowledge was disputed. The weather certainly had something to do with the flooding in these yards. Water has never come into the Woodham, Lester, or Sergeant homes and has only touched the sides of the Woodham home during Hurricane Danny and a major flooding event on January 7, 1998. These facts and others stated above do not indicate reprehensible conduct in this case. Businesses in this State that act in accordance with business custom and that do not act reprehensibly should be safe from the imposition of punitive damages.
For these reasons, I respectfully dissent.
NOTES
[1] Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986).
[*] Note from the reporter of decisions: On January 4, 2002, the Supreme Court issued a "certificate of judgment of affirmance"; that certificate of judgment contains the following paragraphs:

"WHEREAS, in keeping with the former order and judgment of this Court entered on December 22, 2000, the appellees, James Lester et al., did on January 5, 2001, file in this Court a remittitur in the amount of $150,419.
"IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the circuit court be reduced to $1,134,596 and as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs.
"IT IS FURTHER ORDERED AND ADJUDGED that the appellants, Cooper & Co., Inc., et al., pay the costs of appeal and the costs taxed against the defendants in the court below will stand as taxed."